**Affirmed as Modified in Part, and Reversed and Remanded in Part, and Opinion and Concurring Opinion filed May 9, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00791-CV

---

### MAN INDUSTRIES (INDIA), LTD., Appellant

### V.

### MIDCONTINENT EXPRESS PIPELINE, LLC, PRIME PIPE INTERNATIONAL, INC., AND THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., Appellees

---

### NO. 14-11-00892-CV

---

### MIDCONTINENT EXPRESS PIPELINE, LLC, Cross-Appellant

### V.

### MAN INDUSTRIES (INDIA), LTD., PRIME PIPE INTERNATIONAL, INC., AND THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., Cross-Appellees

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2008-56539**

---

# O P I N I O N

This is an appeal from the judgment rendered after a nonjury trial in which the parties asserted claims for declaratory judgment, wrongful dishonor of a letter of credit, breach of contract, and breach of fiduciary duty. The claims at issue arose after a pipeline company contracted with a pipe manufacturer and the manufacturer's agent to buy steel pipe and secured the obligation with a standby letter of credit issued by a bank. After the manufacturer failed to timely produce the pipe, the purchase agreement was modified several times to reduce the size of the order and increase the price; the manufacturer nevertheless attempted to draw down the full amount secured by the standby letter of credit and collect amounts that were not due. We have consolidated the cross-appeals of the manufacturer and the purchaser.

In connection with the claims associated with the standby letter of credit, we hold that the trial court did not err in ordering the manufacturer to pay the bank's indemnitor for the attorneys' fees the bank incurred in its Texas declaratory-judgment action. Although an award of attorneys' fees is not authorized under New York's version of the Uniform Commercial Code that governs the construction of the standby letter of credit, such an award is authorized under Texas declaratory-judgment law. The trial court also did not err in ordering the manufacturer to pay the purchaser's expenses of litigation, because such an award is permissible under the Texas version of the UCC. Moreover, the evidence is legally sufficient to support an award to the purchaser of damages for the fees and finance charges the purchaser was required to pay as a result of the manufacturer's failure to timely return a duplicate letter of credit and its willful misconduct in making a materially fraudulent presentation of another letter of credit.

2

As for the remaining claims of breach of contract and breach of fiduciary duty, we hold that because the manufacturer and its agent agreed that the agent would be paid a sales commission on products shipped, the trial court erred in awarding the agent a commission on pipe that was not produced or sold, and thus, was not shipped. The trial court did not err in failing to find that the agent breached a fiduciary duty to the manufacturer or in ordering the manufacturer to pay the purchaser "cover" damages for its purchase of replacement goods when the manufacturer failed to meet its contractual obligations. Finally, we hold that the trial court did not err in enforcing a contract modification to which the purchaser agreed, or in concluding that the purchaser's obligation to pay for pipes that it accepted was not excused by the manufacturer's tardiness in delivering the goods. Thus, we affirm in part, affirm as modified in part, and remand the case for recalculation of interest[1] and offsets and for rendition of judgment in accordance with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Midcontinent Express Pipeline, LLC ("Midcontinent") was established to build and operate a 500-mile natural-gas pipeline from Oklahoma to Alabama. Man Industries (India), Ltd. ("Man") is a pipe manufacturer based in Mumbai, India. Prime Pipe International, Inc. ("Prime Pipe") is a broker of pipe for use in pipeline projects, and acted as Man's agent and sales representative in the United States.

---

[1] In the final judgment, prejudgment interest recoverable by the manufacturer's agent was calculated on different dates for different parts of the judgment, and prejudgment interest on amounts due to the purchaser began on a third date, both for its own claims and for amounts it was awarded as the bank's indemnitor. The trial court further ordered that amounts paid into the registry of the court were to be paid to the purchaser, with the interest on that amount being paid to the agent in partial satisfaction of its judgment against the manufacturer. Under the circumstances, the trial court is in the best position to determine which amounts are to be offset against one another and to recalculate the prejudgment interest on the reduced amounts at issue.

3

## A. Agency Agreement

Man and Prime Pipe entered into an Agency Agreement in which Prime Pipe agreed to negotiate and enter into contracts in the United States on Man's behalf for the sale of Man's products. In that capacity, Prime Pipe brokered a contract under which Man agreed to supply pipe for construction of Midcontinent's pipeline. The Agency Agreement served as the master agreement between Prime Pipe and Man, but they modified the commission schedule applicable to the sales to Midcontinent. We refer to the latter commission schedule as the "Midcontinent Commission Agreement." In sending the signed payment schedule of the Midcontinent Commission Agreement to Prime Pipe, Man wrote that it conditioned its approval on several considerations, one of which is as follows:

> In the event of any changes in scope of supplies such as change in itemized quantities, el[i]mination of coating work etc. which shall have impact on the Contract Price, the commis[s]ions shall be subject to requisite adjustments arrived by logical re-calculations, which shall very [sic] much in line with the basic agreement.

## B. Purchase Order Agreement

Midcontinent's contract with Man took the form of a Purchase Order. Under the agreement's terms, Man and Prime Pipe (defined collectively as "Supplier" in the agreement) were to supply Midcontinent with four kinds of coated pipe in a total quantity of more than 1.3 million feet. Man was to be paid a fixed price per foot of pipe, and the contract specified that the prices were "not subject to escalation." Midcontinent had the right to decrease the order quantity by as much as ten percent. The parties agreed that Midcontinent would have a certain amount of time to finalize the quantities of pipe ordered.

Because Midcontinent had to complete the pipeline by a certain time, it repeatedly stressed that time was of the essence, and the parties agreed to a

production schedule. They agreed that Man would dedicate two specific mills to producing pipe for Midcontinent and would begin production by September 30, 2007 and deliver the last of the pipe no later than August 31, 2008. Midcontinent advanced Man approximately $21.6 million to secure a portion of the raw materials. The parties agreed that Midcontinent could terminate the contract, in whole or in part, if Man and Prime Pipe failed to timely perform their obligations or failed to provide Midcontinent reasonable assurance of future performance on terms acceptable to Midcontinent.

In finalizing its order, Midcontinent decided that the pipes should be double-jointed before being coated; that is, pairs of 40-foot pipes would be welded together to make units 80 feet long. Man does not double-joint pipe and could not have transported such pipe from its plant to the port. Moreover, Midcontinent decided that the pipe should be coated in the United States, and Man has no facilities in this country. Man knew that Prime Pipe planned to bid on the contract and subcontract the work. Man had no objections to this; Man wanted Prime Pipe to win the contract, and one of Man's representatives even visited the coating facility. Midcontinent did award the contract to Prime Pipe.

## C.    First Cover

Man fell behind schedule almost immediately. In September 2007, one of the mills that was to have been dedicated to this contract was still being used to produce pipe to fill a prior order for a different customer; the other mill was not yet at full production. Midcontinent refused Man's request to extend the time for performance by one month. Because Midcontinent requested but failed to receive adequate assurance that Man would make up the production deficit in a timely manner, Midcontinent informed Man in November 2007 that it had contracted with a third party to produce ten percent of the quantity of one type of pipe called for

5

under the Purchase Order. Midcontinent's net cost to cover this reduction was $3,720,800.66. This was the least expensive pipe that could be delivered by the deadline, and it is undisputed that the price was fair market.

## D. Deficit in Man's Steel Supply

At a meeting between the parties on or about March 12, 2008, Man told Midcontinent that it would run out of steel before completing production. According to Man, various suppliers had agreed to allocate part of their schedules to producing steel to sell to Man at a stated price, but because the price of steel had increased, the suppliers were not honoring those agreements. Man asked Midcontinent to pay an additional $16 million as a result of the increased steel prices, and Midcontinent refused.

On April 1, 2008, Man informed Midcontinent that three mills had agreed to allocate slots in their respective production schedules to producing steel for Man to use in finishing the contract. Three-quarters of the steel would have to be shipped from China, and some of it could not be received in time for Man to complete production as scheduled. Man also told Midcontinent that securing this steel would have "commercial implications" that it wished to "resolve suitably so as to ensure the larger interest of successful completion of the project." Man also asked for the production schedule to be extended by three weeks. On April 10, 2008, Man wrote to Midcontinent that obtaining the steel necessary to complete the order would have a "huge financial impact" on Man and stated that if Man and Midcontinent did not meet "to resolve this and other matters the forward movement will get adversely affected."

## E. Letter Agreement and Second Cover

The parties met on April 15, 2008 and negotiated a Letter Agreement

6

modifying the Purchase Order. At the meeting, Man stated that it would run out of steel in a few days, but that it could obtain 28,000 metric tons of steel in time for it to produce a reduced quantity of pipes in June and July. Of the approximately 39,000 metric tons of steel needed to complete the order, Man acknowledged that it could not obtain 11,000 metric tons in time to produce the pipes before the end of the production schedule. Midcontinent refused to extend the production schedule by an additional three weeks as Man requested, and Man acknowledged that to meet the schedule, Midcontinent must reduce its order from Man by an additional ten percent and cover the shortage in the pipe market. All parties reserved their rights to contest the extent to which Midcontinent was entitled to an award of damages for this cover. Midcontinent ultimately covered the deficit by purchasing double-jointed coated pipe from a company in the United States at a net cost of $17,090,745.67. Man does not dispute that Midcontinent paid a fair market price.

Although Man needed less steel to complete the contract as amended, it faced a total estimated price increase of about $12.5 million to obtain the 28,000 metric tons of steel, of which Midcontinent agreed to contribute $4.4 million. As consideration for Midcontinent's contribution in excess of the amount contemplated in the Purchase Order, Man agreed to have issued to Midcontinent a standby letter of credit for $15 million. Under the terms of the standby letter of credit, Midcontinent would be able to draw funds by certifying to the issuer that Man had breached the Purchase Order as amended, and could then apply the funds to its damages. Representatives of Midcontinent, Man, and Prime Pipe each signed the Letter Agreement.

Despite these modifications, Man did not deliver the reduced quantities of pipe until September and October 2008. Midcontinent accordingly presented the letter of credit to the issuer and received $15 million to apply to its damages.

7

Midcontinent paid into the registry of the court the $4.4 million it had agreed in the Letter Agreement to pay Man.

## F.    JPMorgan Chase Standby Letter of Credit

In the original Purchase Order Agreement, the parties agreed that Midcontinent would provide Man with a commercial letter of credit that it could draw upon as payments became due.  In negotiating for Man to receive a large advance payment, however, the parties modified this part of their agreement so that Midcontinent would provide a standby letter of credit for more than $33 million.  Man could draw against the standby letter of credit if invoices became past due.  Midcontinent initially provided a standby letter of credit from JPMorgan Chase, but later changed its credit facility and provided Man with a standby letter of credit from the Bank of Tokyo-Mitsubishi UFJ, Ltd. ("the Bank").  Midcontinent submitted the replacement standby letter of credit to Man in May 2008, and Man acknowledged receipt on June 25, 2008.  Man then wrote to the State Bank of India to return the JPMorgan Chase standby letter of credit to the issuer.  The issuer received it on August 25, 2008.  Between June 25 and August 25, 2008, Midcontinent incurred $30,523.85 in bank fees to keep the JPMorgan Chase standby letter of credit open, even though Man had a standby letter of credit from the Bank throughout this time that covered the same obligation.

## G.    The Bank's Standby Letter of Credit

When the parties switched from using a commercial letter of credit to using standby letters of credit, they agreed that when a shipment left India, Man would invoice Midcontinent for 80% of the shipment price.  Midcontinent would pay the invoice within seven days after receiving the original invoice and original shipping documents.  Man would send an invoice for the remaining 20% of the shipment price to be paid by Midcontinent within seven days after the pipe was discharged at

the Port of Houston. The Purchase Order provided that the time for payment commenced upon the latest of (1) Midcontinent's actual receipt of the invoice and supporting documents, (2) its inspection and acceptance of the pipe, (3) Man's compliance with all requirements of the Purchase Order, or (4) the date a corrected invoice was received.

In obtaining a standby letter of credit from the Bank, Midcontinent and the Bank agreed that New York law would govern their contract and that Midcontinent would pay all of the Bank's reasonable expenses incurred in connection with any letter of credit or any demand for payment or failure to pay under any letter of credit. The standby letter of credit had an expiration date of September 30, 2008.

On September 23, 2008, Man attempted to draw the entire $33,298,751.48 covered by the standby letter of credit. At that time, Midcontinent's maximum remaining future payment obligation to Man was approximately $19 million. Because the presentation documents were not presented at the Bank's offices in New York, the Bank refused the presentation.

Two days later, Midcontinent filed this suit seeking a temporary restraining order and temporary injunction to prevent Man and Prime Pipe from presenting the standby letter of credit and to allow the Bank to rely on the temporary restraining order as authority to refuse payment. On the same day, the trial court granted the requested relief and Man and the Bank were notified of the temporary restraining order.

The next morning, Man caused the standby letter of credit to be presented at the Bank's New York office, but failed to present a signed beneficiary statement as required under the instrument's terms. The Bank again refused payment, and a few days later, the standby letter of credit expired.

## H.     The Claims at Issue

In addition to the claims for injunctive relief described above and other claims not at issue in this appeal, Midcontinent and Prime Pipe sued Man for breach of contract; Man sued Prime Pipe for breach of fiduciary duty; Man sued the Bank for wrongful dishonor of the standby letter of credit; and the Bank sued Man for declaratory judgment.[2]  Midcontinent, the Bank, and Prime Pipe each prevailed at least in part in their claims against Man, and Man partially prevailed in its breach-of-contract claims against Midcontinent.

Before offsets, the trial court awarded Midcontinent damages of $26,740,381.85 on its claims against Man, which included (1) $30,523.84 in banking fees for keeping the JPMorgan Chase standby letter of credit open while Man was in possession of the Bank's standby letter of credit; (2) $425,058.66 for keeping the Bank's standby letter of credit "open" after its expiration date as a result of this litigation; (3) $2,818,581.75 for attorneys' fees incurred by the Bank and paid by Midcontinent pursuant to its indemnity agreement with the Bank; (4) $3,720,800.66 for covering Man's first production deficit in November 2007; and (5) $17,090,745.67 for covering Man's second deficit in April 2008.[3]  The trial court additionally awarded Midcontinent $64,476.10 as "expenses of litigation," and attorneys' fees of more than $1.6 million through the date of judgment.

Man prevailed in its claim that Midcontinent breached the Letter Agreement by failing to pay Man the additional $4.4 million called for in that document.  The trial court offset those and other damages awarded to Man against the damages

---

[2] The trial court denied Man's special appearance, and we affirmed that decision.  *See Man Ind. (India) Ltd. v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 309 S.W.3d 589 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

[3] These amounts do not account for all of the damages awarded, but we do not address the damages that are not at issue in this appeal.

awarded to Midcontinent, leaving a net damage award to Midcontinent in the amount of $4,927,143.85. The trial court also found that Man incurred attorneys' fees of $429,749.13 in connection with its breach-of-contract claim against Midcontinent, and reduced the award of Midcontinent's attorneys' fees by that amount.

The trial court's award to Prime Pipe included $1,022,146.22 for unpaid commissions based on the two ten-percent reductions in Midcontinent's pipe order in November 2007 and April 2008.[4] The trial court also awarded Prime Pipe $540,000 for attorneys' fees through the date of judgment.

Finally, the trial court made the declarations requested by the Bank, and ordered Man to pay the Bank's attorneys' fees to Midcontinent. The trial court also awarded Midcontinent, the Bank, and Prime Pipe additional attorneys' fees in the event that Man pursues an unsuccessful appeal.

The trial court made extensive findings of fact and conclusions of law and issued additional findings and conclusions at the parties' requests. Man and Midcontinent each appealed the judgment, and we consolidated their cross-appeals.

## II. ISSUES

In its first issue, Man argues that the trial court erred in awarding Midcontinent damages that compensated it for (a) charges paid in connection with the various letters of credit; and (b) attorneys' fees incurred by the Bank as a result of Man's claims regarding the standby letter of credit, and which Midcontinent was required to pay under its indemnification contract with the Bank. In the same issue, Man challenges the trial court's award of Midcontinent's expenses of

---

[4] The total amount of actual damages awarded to Prime Pipe was $1,509,548.21, which included some unpaid commissions that are not disputed, as well as amounts that Man agreed to pay for damaged pipe.

litigation. In its second issue, Man contends that the trial court erred in awarding Prime Pipe a sales commission on pipe that was eliminated from the Purchase Order by the Letter Agreement modifying the parties' contract. Man asserts in its third issue that the trial court erred in failing to find that Prime Pipe breached its fiduciary duty to Man. In its fourth issue, Man challenges the factual sufficiency of the evidence supporting the trial court's award to Midcontinent of $20.8 million in cover damages.

In its cross-appeal, Midcontinent lists five issues concerning the trial court's enforcement of the Letter Agreement modifying the parties' contract. In its first three issues, Midcontinent argues that Man's commercial bad faith rendered the contract modification ineffective. In its remaining two issues, Midcontinent contends that its obligation to pay Man the additional $4.4 million specified in the Letter Agreement was excused by Man's prior material breach.

### III. STANDARD OF REVIEW

In an appeal from the judgment rendered after a nonjury trial, we review the trial court's findings using the same standards of review that apply to a jury's verdict. *MBM Fin. Corp. v. Woodlands Operating Co.*, *L.P.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). If one or more elements of a ground of recovery or defense have been found by the trial court, then omitted unrequested elements, when supported by the evidence, are supplied by presumption in support of the judgment. TEX. R. CIV. P. 299. To analyze the legal sufficiency of the evidence supporting an express or implied finding, we review the record in the light most favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "rises

12

to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Evidence is legally insufficient only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. On the other hand, a factfinder "may not simply speculate that a particular inference arises from the evidence." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). If the evidence does no more than give rise to mere surmise or suspicion, then it is legally insufficient. *Id.*

In evaluating a factual-sufficiency challenge to express or implied findings, we consider and weigh all of the evidence in a neutral light and set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We defer to a trial court's factual findings if they are supported by evidence. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008). We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence clearly would support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

We review a trial court's conclusions of law de novo to determine if the trial court drew the correct legal conclusions from the facts. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If the trial court rendered the proper judgment, we will not reverse it even if the trial court's conclusions of law are incorrect. *Id.* The trial court's decision regarding which state's law applies to

13

an issue also is a question of law subject to de novo review. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000).

## IV. MAN'S APPEAL

## A. Claims Associated with the Standby Letter of Credit

In its first issue, Man contends that the trial court erred by awarding Midcontinent damages regarding the standby letter of credit. These include awards to Midcontinent of attorneys' fees incurred by the Bank, Midcontinent's expenses of litigation, finance charges incurred by Midcontinent to maintain two standby letters of credit at the same time, and finance charges that the Bank charged to Midcontinent to keep the letter of credit "open" after its expiration date. We address each separately.

### 1. Bank's Attorneys' Fees

Man asserts that the trial court erred in awarding Midcontinent the amounts it paid to indemnify the Bank for its attorneys' fees incurred in its litigation with Man about the standby letter of credit. The trial court concluded that the fee award was proper (a) under the Texas version of the Uniform Declaratory Judgments Act ("the UDJA"), and (b) as damages for Man's breach of the Purchase Order. Because we conclude that the fee award was authorized by the UDJA, we do not address the trial court's alternative basis for the award.

Man argues that the trial court could not rely on the UDJA as support for an award of attorneys' fees because the standby letter of credit is governed by New York law. This argument turns on the difference between matters of substantive law and matters of procedure. Even if a contract contains a choice-of-law provision in which the parties have agreed to apply the law of a different state, "we as the forum will apply our own law to matters of remedy and procedure."

14

*Autonation Direct.com, Inc. v. Thomas A. Morehead, Inc.* 278 S.W.3d 470, 472 (Tex. App.—Houston [14th Dist.] 2009, no pet.) Man contends that the ability to recover attorneys' fees is a substantive issue, and that the trial court therefore should have applied the law that governs the substantive issues connected with the letter of credit. Man then points out that although the Texas version of the UCC provision concerning letters of credit provides that "[r]easonable attorney's fees and other expenses of litigation may be awarded to the prevailing party in an action in which a remedy is sought under this chapter," the analogous section of New York's version of the UCC does not contain this provision. *Compare* TEX. BUS. & COM. CODE ANN. § 5.111(e) (West 2011) *with* N.Y. U.C.C. Law § 5-111 (McKinney 2001). Man argues that because all of the Bank's requests for declaratory judgment required the trial court to construe the Bank's standby letter of credit with Midcontinent or to determine the parties' rights under it, the trial court should have applied New York law in determining whether to award attorneys' fees.

The cases on which Man relies, however, concern fee awards to the prevailing party in a suit on a contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. 38.001(8) (West 2008) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."); *Midwest Med. Supply Co., L.L.C. v. Wingert*, 317 S.W.3d 530, 537 (Tex. App.—Dallas 2010, no pet.) ("[T]he recovery of attorneys' fees *for breach of a contract* is a substantive, not a procedural, issue and will be governed by the law governing the substantive issues.") (emphasis added);[5] *Fairmont Supply Co. v. Hooks Indus., Inc.*, 177

---

[5] In *Midwest Medical Supply*, Midwest moved for attorneys' fees under Texas Civil Practice and Remedies Code section 38.001, under which attorneys' fees are recoverable by the prevailing party in a contract action, and Wingert moved for attorneys' fees under the Texas

S.W.3d 529, 535–36 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (because the plaintiff sought attorneys' fees in connection with the successful prosecution of its breach-of-contract claim and the contract contained a choice-of-law provision specifying that Pennsylvania law applied, the plaintiff could not recover attorneys' fees because they were not available under Pennsylvania law); *Rapp Collins Worldwide, Inc. v. Mohr*, 982 S.W.2d 478, 487–88 (Tex. App.—Dallas 1998, no pet.) (holding, in a breach-of-contract action, that an award of attorneys' fees is a substantive right, and is governed by the law of the state governing the substantive issues).

Awards of attorneys' fees in a declaratory-judgment action are governed by a different statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008) ("In any proceeding under [the UDJA], the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). The body of law concerning a mandatory award of attorneys' fees in a suit on a contract does not necessarily apply to a discretionary award of attorneys' fees in a declaratory-judgment action. We have found only one other published Texas case in which the reviewing court considered whether our UDJA applies to the declaration of rights under a contract governed by the substantive law of another jurisdiction. Faced with this question, the Thirteenth Court of Appeals held that "because [the Act] is procedural in nature, its application is appropriate even when applying the substantive law of another jurisdiction." *Creative Thinking Sources, Inc. v. Creative Thinking, Inc.*, 74 S.W.3d 504, 513 (Tex. App.—Corpus Christi 2002, no pet.). In support of this conclusion, the court cited *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440, 444 (Tex. 1993), in which the Act is

---

Uniform Declaratory Judgments Act. The trial court denied both fee requests. Because Midwest appealed from the judgment but Wingert did not, the appellate court addressed only the trial court's denial of attorneys' fees under section 38.001.

described as "merely a procedural device for deciding cases already within a court's jurisdiction." The Supreme Court of Texas has repeated this pronouncement many times. *See, e.g.*, *Tex Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011) (same); *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (per curiam) (same); *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996) (per curiam) (same); *State v. Morales*, 869 S.W.2d 941, 947 (Tex. 1994) (same).[6]

We also consider it significant that, by its terms, the UDJA must be "so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002 (West 2008). Treating the provisions of the UDJA as procedural rather than substantive is consistent with the treatment afforded to federal declaratory-judgment law and the law of the states enacting various versions of the Uniform Declaratory Judgments Act.[7] We therefore

---

[6] On appeal, Man additionally argues that attorneys' fees are not recoverable under New York's declaratory-judgment law; however, this was a proceeding under Texas's declaratory-judgment statute, which does permit the recovery of attorneys' fees, and Man did not plead and prove in the trial court that New York's declaratory-judgment law both applies and differs from Texas law. *See Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 769 (Tex. App.—Corpus Christi 1999, pet. denied) (where party requesting judicial notice fails to provide adequate proof of the law's content, the court will presume that the law of the other jurisdiction is the same as Texas law).

[7] *See, e.g.*, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S 667, 671, 70 S. Ct. 876, 879, 94 L. Ed. 1194 (1950) ("'The operation of the Declaratory Judgment Act is procedural only.'" (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, 57 S. Ct. 461, 463, 81 L. Ed. 617 (1937))); *Jefferson v. Asplund*, 458 P.2d 995, 997 (Alaska 1969) ("In regard to the federal prototype of Alaska's Declaratory Judgments Act, judicial precedent has established the federal Declaratory Judgment Act is both remedial and procedural in nature, creating no substantive rights or duties."); *Am. Family Mut. Ins. Co. v. Bowser*, 779 P.2d 1376, 1380 (Colo. Ct. App. 1989) (stating that a declaratory judgment provides "a procedural, not a substantive, remedy"); *Wilson v. Kelley*, 224 Conn. 110, 116, 617 A.2d 433 (1992) (rejecting implication that "the declaratory judgment statute and rules created substantive rights that did not

conclude that the trial court did not err in applying Texas law as set forth in our version of the UDJA.

Under the Texas act, the trial court was permitted to award reasonable and necessary attorneys' fees "as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. Man does not contend that the fees awarded were not reasonable and necessary, or that in ordering Man to pay the Bank's attorneys' fees to Midcontinent as the Bank's indemnitor, the trial court reached a result that was not equitable and just. *See also* TEX. BUS. & COM. CODE ANN. § 1.305 (West. 2009) ("[N]either consequential or special damages nor penal damages may be had except as specifically provided in this title *or by other rule of law*.") (emphasis added).

---

otherwise exist"); *Acevedo v. Kim*, 284 Ga. 629, 633, 669 S.E.2d 127, 130 (2008) ("The sole question is whether a declaratory judgment action is the proper *procedural* vehicle for resolving the dispute.") (emphasis added); *Beahringer v. Page*, 204 Ill. 2d 363, 373, 789 N.E.2d 1216, 1223–24 (2003) ("A declaratory judgment action is strictly remedial. The statute does not create substantive rights or duties, but merely affords a new, additional, and cumulative procedural method for the judicial determination of the parties' rights."); *Giroir v. Dumesnil*, 248 La. 1037, 1057, 184 So. 2d 1, 8 (1966) ("The declaratory judgment statute merely creates a procedural device whereby the courts may make a declaration of rights without the executory or coercive relief embodied in a conventional judgment."); *Fleischmann v. Mercantile Trust Co. of Balt.*, 192 Md. 680, 685, 65 A.2d 182, 184 (1949) ("[The Uniform Declaratory Judgments Act] does not create new substantive rights."); *Father Flanagan's Boys' Home v. Graybill*, 178 Neb. 79, 84, 132 N.W.2d 304, 308 (1964) ("The Uniform Declaratory Judgements [sic] Act is a procedural act."); *In re Envtl. Ins. Declaratory Judgment Actions*, 149 N.J. 278, 302, 693 A.2d 844, 855 (1997) ("A declaratory judgment act merely provides a procedural device to accelerate the resolution of a dispute; the procedural device does not alter the substance of the dispute. . . . Declaratory judgment actions do not change any substantive rights . . . ."); *Travelers Indem. Co. v. Cochrane*, 155 Ohio St. 305, 312, 98 N.E.2d 840 (1951) ("The purpose of the Uniform Declaratory Judgments Act is to provide procedural means to settle controversies and to afford relief from uncertainty with respect to rights, status and other legal relations."); *Felts v. Richland County*, 299 S.C. 214, 216, 383 S.E.2d 261, 262–63 (S.C. Ct. App. 1989) ("The Uniform Declaratory Judgments Act which has been adopted by most state jurisdictions is remedial and procedural in nature and does not create substantive rights or duties. This is also true of the Federal Declaratory Judgment Act."), *aff'd*, 303 S.C. 354, 400 S.E.2d 781 (1991); *Agar Sch. Dist. No. 58-1 Bd. of Educ., Agar, S.D. v. McGee*, 527 N.W.2d 282, 289 (S.D. 1995) ("A declaratory judgment statute does not create or change any substantive rights . . . .").

We accordingly overrule this part of Man's first issue and affirm this part of the judgment.

### 2.    *Midcontinent's Expenses of Litigation*

Man next asserts that the trial court erred in awarding Midcontinent $64,476.10 as "expenses of litigation" under Texas law rather than applying New York law. Under Texas Business and Commerce Code section 1.301(a),

> [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this state.

TEX. BUS. & COM. CODE ANN. § (West 2009). It is stated in comment 3 to this provision that "[w]here a transaction has significant contacts with a state which has enacted the [UCC] and also with other jurisdictions, the question what relation is 'appropriate' is left to judicial decision. In deciding that question, the court is not strictly bound by precedents established in other contexts." *Id.* cmt. 3.

Man does not address this provision, but simply points out that the standby letter of credit is governed by New York law, and New York's version of the UCC does not authorize recovery of the expenses of litigation. *See* N.Y. U.C.C. Law § 5-111. Midcontinent, however, contends that the trial court properly applied Texas law because the parties agreed that the Purchase Order is governed by Texas law. Under Texas's version of article 5.111 of the Uniform Commercial Code, expenses of litigation may be awarded to the prevailing party in an action in which a party seeks a remedy under the UCC provisions concerning letters of credit. TEX. BUS. & COM. CODE ANN. § 5.111. It is stated in comment 6 that this provision applies "even when the remedy might be an injunction under Section 5-109 or when the claimed remedy is otherwise outside of Section 5-111." *Id.*

19

§ 5.111 cmt. 6.

Here, Midcontinent sought an injunction under Texas Business and Commerce Code section 5.109(b). Section 5.109 applies "[i]f a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit." TEX. BUS. & COM. CODE ANN. § 5.109(b) (West 2011). More specifically, subsection 5.109(b) of the Texas statute applies if an applicant such as Midcontinent "claims that a required document is forged or materially fraudulent or that the honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant . . . ." Id. § 5.109(b). The trial court found that "[b]y pleading a claim under UCC Article 5, [Midcontinent] pled a claim for the expenses of litigation awarded under UCC Article 5.111(e) & cmt 6." We agree.

As Midcontinent stated in its pleadings, "The Letter of Credit specifically states that for the [B]ank to honor presentment, Man must submit a statement certifying, among other things, 'that such funds are due us [Man] as there has been a payment default of obligations by [Midcontinent] under' the Purchase Order." To determine whether Man submitted a materially fraudulent document to the Bank by certifying that Midcontinent was in default, the trial court had to refer to the terms of the Purchase Order and its amendments to determine when payment was due. See Sun Marine Terminals, Inc. v. Artoc Bank & Trust, Ltd., 797 S.W.2d 7, 11 (Tex. 1990).[8] Midcontinent, Man, and Prime Pipe agreed in the Purchase Order that "the laws of Texas (without giving effect to Texas choice of law rules)

---

[8] There, the Texas Supreme Court explained,

One cannot ascertain by looking solely to the terms of the letter of credit whether Uni actually owed Sun for services rendered because the letter of credit does not state what services Sun was to perform or how and when Uni was to pay. One must refer instead to the agreement which does set out Sun's and Uni's obligations to one another.

shall govern any interpretation or construction of the Purchase Order and/or the parties' rights, remedies and obligations in connection herewith." Because the Purchase Order is a contract for the sale of goods and is subject to the Texas UCC, that law bears both a "reasonable" and an "appropriate" relation to Man's representation to the Bank that Midcontinent was in default of its contractual obligations under the Purchase Order. Moreover, because nothing in the Purchase Order indicated that letters of credit issued to Man would be subject to a different choice-of-law provision; the choice of law governing the letter of credit was instead the result of an agreement between Midcontinent and the Bank, not the contract between Midcontinent and Man. Thus, the application of Texas law also appears to be consonant with the parties' expectations,

Finding no error in the trial court's application of Texas law, we overrule this part of Man's first issue and affirm this portion of the judgment.

### 3.    *Fees Midcontinent Incurred to Maintain Two Letters of Credit*

As relevant to the next award, the trial court found that "Midcontinent incurred $30,523.85 in additional bank fees to keep the JPMorgan Chase Letter of Credit open while Man had possession" of standby letters of credit both from that issuer and from the Bank. The trial court further found, "Had Man kept only one letter of credit (as required by the parties' agreement) and promptly returned the JPMorgan [Chase] letter of credit, [Midcontinent] would not have incurred these damages." Man argues that there is no contractual basis for the award, and that the award additionally is barred by a provision in the Purchase Order prohibiting consequential damages. We disagree.

The record shows that Midcontinent first caused a standby letter of credit to be issued to Man from JPMorgan Chase. Man was told in 2007 that the original standby letter of credit would expire in August 2008, but that Midcontinent would

21

have its own credit facility in place in December 2007. Midcontinent then would replace the first letter of credit with a standby letter of credit having an expiration date of September 30, 2008. The record shows that the replacement standby letter of credit was issued on or about May 12, 2008. A witness from Prime Pipe testified that Man promised it would return the original letter of credit within a couple of days, but the witness could not recall when that statement was made. A witness from Man, however, admitted that Man had known since 2007 that the original standby letter of credit would be replaced; that Midcontinent asked Man to return the JPMorgan Chase standby letter of credit when the replacement standby letter of credit was issued; and that the replacement letter was issued in mid-2008. Thus, the evidence supports the trial court's implied finding that Man agreed to return the JPMorgan Chase standby letter of credit within a reasonable time after the replacement standby letter of credit was issued.

Despite this agreement, JPMorgan Chase did not receive the original standby letter of credit until August 25, 2008—less than a week before it expired, but more than three months after the replacement letter was issued. The trial court found that "Man failed to release the JPMorgan letter of credit in a timely manner." Significantly, Man does not challenge the trial court's factual finding, and the finding supports the trial court's conclusion that Man breached its agreement.

This leaves only the question of damages. Man asserts that these fees are consequential damages and that the Purchase Order expressly bars awards of consequential damages. We need not characterize the damage award, however, because Man acknowledges that under the actual terms of the Purchase Order, the parties agreed that "[n]otwithstanding any provision to the contrary, neither party shall be liable to the other for any consequential, punitive or exemplary damages of any type . . . *except . . . resulting from gross negligence or willful misconduct*."

22

(emphasis added). If, as Man asserts, the damages are properly characterized as consequential damages, then we must presume the trial court found that in failing to timely return the original standby letter of credit, Man engaged in gross negligence or willful misconduct. *See* TEX. R. CIV. P. 299. Man nevertheless has not challenged such an implied finding.[9]

We overrule this part of Man's first issue and sustain this portion of the damage award.

### 4. Fees Midcontinent Incurred to Keep the Standby Letter of Credit "Open" After its Expiration

Among the damages awarded to Midcontinent, the trial court included $425,058.66 to reimburse Midcontinent for banking fees it paid to keep the Bank's standby letter of credit "open" after the temporary restraining order was issued and the letter of credit expired. According to Midcontinent, the Bank charged these fees because it considered the standby letter of credit to remain "outstanding" for as long as Man continued to assert that the Bank had wrongfully dishonored the letter of credit.

Man contends that the trial court erred in awarding Midcontinent these damages because (a) Man's presentation of the standby letter of credit was not a breach of the Purchase Order, and (b) the Purchase Order bars awards of consequential damages. We need not address Man's first argument because under the terms of the Purchase Order, one party can be held liable for another's

---

[9] The record contains legally sufficient evidence supporting such an inference of gross negligence or willful misconduct. Man was well aware of the substantial charges associated with letters of credit—so much so, in fact, that it arranged at the start of the contract to shift some of the charges to Midcontinent for letters of credit that Man needed to provide to its own steel suppliers. Man did not acknowledge receipt of the replacement letter of credit until June 25, 2008, more than six weeks after the replacement was issued, and a further two months passed before the original standby letter of credit was received by JPMorgan Chase. The record contains no explanation for these delays.

consequential damages for conduct other than a breach of contract. As previously mentioned, the parties agreed that "[n]otwithstanding any provision to the contrary, neither party shall be liable to the other for any consequential . . . damages of any type . . . except . . . resulting from gross negligence or willful misconduct." The trial court found that Man's presentation of the standby letter of credit to the Bank was materially fraudulent and that Midcontinent paid these charges "because of Man's presentation and continued pursuit" of payment under that instrument.

Although Man was entitled to payment under the standby letter of credit only if an invoice was not timely paid, Man attempted to draw the entire amount of the standby letter of credit—an amount exceeding $33 million—even though Man knew that Midcontinent was not in default of any past payment obligations, and the maximum amount of Midcontinent's *future* payment obligations was less than $19.4 million. Tellingly, Man first presented the letter of credit the day after Midcontinent presented the $15 million letter of credit that Man had provided to Midcontinent as an advance payment to be applied to Midcontinent's damages in the event that Man breached the amended Purchase Order. The record therefore supports an implied finding that Man engaged in its materially fraudulent conduct to retaliate against Midcontinent for drawing against Man's letter of credit, even though Midcontinent was entitled to do so. And because Man asserted in this suit that the Bank wrongfully dishonored the letter of credit, the Bank could not "close the books" until this matter was resolved, and continued to charge fees to Midcontinent for maintaining the letter of credit.

The Purchase Order does not prohibit an award of consequential damages for such willful misconduct. We therefore overrule this part of Man's first issue and sustain this portion of the damage award.

24

**B.    Man's Breach-of-Fiduciary-Duty Claim Against Prime Pipe**

Man also asserts that the trial court erred in failing to find that Prime Pipe breached its fiduciary duty to Man by excluding Man from Prime Pipe's coating contract with Midcontinent.[10]  We conclude, however, that Prime Pipe did not breach its fiduciary duty to Man by bidding on work to be performed in the United States or by hiring subcontractors in the United States to execute the contracts, because these tasks were outside the scope of its fiduciary duty.

An agent has a fiduciary duty "to act primarily for the benefit of another in matters connected with his undertaking." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (quoting RESTATEMENT (SECOND) OF AGENCY § 387, cmt. a (1958)).  When determining the scope of an agent's fiduciary duty, courts must consider "not only the nature and purpose of the relationship, but also agreements between the agent and principal." *Nat'l Plan Administrators, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

Here, Prime Pipe represented Man in negotiating and entering into contracts for the sale of Man's products.  As defined in the Agency Agreement, Man's "[p]roducts are those manufactured by Man."[11]  Prime Pipe did not agree to represent Man in obtaining contracts for work to be performed by other companies. The parties did agree, however, that they would "decide over the involvement of each other on a case-to-case basis."  As the trial court found,

- Prime Pipe fully disclosed to Man that it intended to submit a bid to Midcontinent for the coating work in the United States;

---

[10] Although Man included in its statement of this issue that it also was challenging the trial court's failure to find that Prime Pipe breached its fiduciary duty to Man by failing to make insurance claims on Man's behalf, Man did not brief this point.  This argument accordingly is waived.  *See* TEX. R. APP. P. 38.1(i).

[11] Capitalization normalized.

25

- Man approved of Prime Pipe's intention to bid on the Midcontinent coating work in the United States;

- Man never objected to Prime Pipe performing the coating work; and

- Man was aware of and acquiesced in the bidding on and performance of the coating contract by Prime Pipe.

Considering the terms of the Agency Agreement and these unchallenged findings of fact, we conclude that the trial court did not err in failing to hold that Prime Pipe breached a fiduciary duty to Man. We accordingly overrule this issue and affirm this part of the judgment.

## C. Prime Pipe's Commission Claim Against Man

The trial court awarded Prime Pipe $1,022,146.22 for commissions that Prime Pipe was not paid because Midcontinent twice reduced the pipe order by ten percent. On appeal, Man does not challenge the trial court's award of $511,073.11 in connection with the first ten-percent reduction of Midcontinent's order in November 2007. Man does contend, however, that Prime Pipe was not entitled to recover a similar sum for the second ten-percent reduction of the order in April 2008 because, unlike the first reduction, Prime Pipe agreed to it. We agree.

In the Agency Agreement between Man and Prime Pipe, the parties agreed as follows:

> Article 4 (Responsibility of MAN):
>
> 1) MAN shall supply their products and related services in accordance with the specifications and requirements of the end customer received through PRIME PIPE.
>
> . . .
>
> 4) MAN shall perform according to the schedules mutually agreed with PRIME PIPE including but not limited to the review of specifications, preparation of procedures and control documents, manufacturing, delivery of finished products and final documentation.

26

5)   MAN shall pay the sales commission to PRIME PIPE in accordance with the provisions of Article 5.

. . .

Article 5 (Commission Expenses and Remittances)

   Commissions:

For the contracts for the supply of MAN products secured by the involvement and efforts of PRIME PIPE from the clients located in the [United States], MAN shall pay the Sales Commission to PRIME PIPE as per the following slabs based on the total quantum of contracts/orders secured in a calendar year:

. . .

c)   Above 10000 MT – 1.00% (One Percent) of FOB[12] Value of shipped goods.

. . .

Unless otherwise agreed on [a] case-to-case basis, the commissions by MAN to PRIME PIPE shall be payable after the completion of supplies and receipt of payment by MAN according to the agreed payment schedule.  Payments to PRIME PIPE shall not be withheld pending resolution of issue[s] pertaining to the products produced by MAN within the scope of contractual specifications.

Based on this language, Prime Pipe presented two theories of recovery. First, it argued that it was entitled to commission based on the "total quantum" of the Midcontinent Purchase Order as originally issued, and should not lose part of its commission after the size of the order was reduced as a result of Man's conduct. Second, Prime Pipe asserted that it was entitled to the commission as damages for Man's breach of the Agency Agreement by failing to supply products in accordance with Midcontinent's requirements and to perform according to the agreed-upon schedules.

---

[12] "F.O.B." means "free on board."  TEX. BUS. & COM. CODE ANN. § 2.319(a) (West 2009).  This signifies that the seller is required "to deliver the goods without expense to the buyer at the place and time mentioned, where title passes."  *Gessmann v. Stephens*, 51 S.W.3d 329, 338 n.6 (Tex. App.—Tyler 2001, no pet.).

27

Man contends that Prime Pipe's arguments rest on an erroneous interpretation of the Agency Agreement and ignore the fact that Prime Pipe agreed to a 10% reduction in the size of Midcontinent's order. We agree.

Under the Agency Agreement's terms, Prime Pipe earns a commission from "the contracts for the supply of Man products secured by the involvement and efforts of Prime Pipe,"[13] but this does language does not specify how the commission is measured. In specifying that amount, the parties expressly agreed that Prime Pipe's commission was to be a particular percentage, of a particular kind of value, "of shipped goods." In the Midcontinent Commission Agreement, the parties changed the percentage and value but did not change the term of "shipped goods" to anything else. *See Grynberg v. Grey Wolf Drilling Co.*, 296 S.W.3d 132, 137 & n.17 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("To the extent of any conflict, specific provisions control over more general ones." (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994))).

Prime Pipe asserts that under the Midcontinent Commission Agreement, the payment schedule "says nothing about the pipe having to be 'shipped' in order for [Prime Pipe's] commission to be due." This is incorrect. The signed Commission Schedule attached to the Midcontinent Commission Agreement provided that part of the commission was to be paid "date of shipment net 7 days," and part was to be paid "port of discharge net 7 days."[14] The Agency Agreement similarly provides that commissions "shall be payable after the completion of supplies and receipt of payment by [Man] *according to the agreed payment schedule*." (emphasis added). Under Man's agreed payment schedule with Midcontinent, Man was to invoice

---

[13] Capitalization normalized.

[14] According to the evidence presented at trial, "[d]ischarge is complete when all the pipe is off the vessel and unhooked."

Midcontinent 80% of the price when each month's quota was shipped, and payment was due net seven days from the date of the invoice. The remaining 20% of the price of each shipment was invoiced when the pipes were discharged from the vessel at the Port of Houston, and payment was due net seven days after discharge of the vessel. Thus, the Commission Schedule under the Midcontinent Commission Agreement is consistent with the Agency Agreement's requirement that commissions "shall be payable after the completion of supplies and receipt of payment by [Man] according to the agreed payment schedule."

Prime Pipe also contends that the Agency Agreement prohibits Man from withholding Prime Pipe's commission "pending the resolution of *any* dispute with the customer." (emphasis added). But that statement is broader than the language of the Agency Agreement. The parties actually agreed that commissions would not be withheld "pending resolution of issue[s] pertaining to the products produced by [Man] within the scope of contractual specifications." Pipe that Man originally agreed but failed to produce are not "products produced by [Man] within the scope of contractual specifications."

Prime Pipe further argues that "Texas law includes a long-standing common-law principle that a broker is entitled to a commission at the time he procures a buyer ready, willing, and able to make an enforceable contract to purchase the seller's property on terms acceptable to him, *unless the broker and seller agree otherwise*." (emphasis added). Here, however, the broker and the seller did expressly agree otherwise.

In sending the signed payment schedule of the Midcontinent Commission Agreement to Prime Pipe, Man wrote that it conditioned its approval on several considerations, one of which is as follows: "In the event of any changes in scope of supplies such as change in itemized quantities, el[i]mination of coating work etc.

29

which shall have impact on the Contract Price, the commis[s]ions shall be subject to requisite adjustments arrived by logical re-calculations, which shall [sic] very much in line with the basic agreement." The evidence shows that in the Letter Agreement of April 16, 2008, Prime Pipe did agree to a reduction in the quantity of pipe to be supplied, and thus, in a reduction of its commission.

The Letter Agreement provides that "[w]hen fully executed by the parties, this letter agreement . . . will amend the Purchase Order with respect to the production schedule for the months of June and July, 2008." The only right that Prime Pipe reserved in the Letter Agreement was the right to contest whether Midcontinent was owed any "damages for any shortfall in the production of the total quantity of pipe under the Purchase Order, including the shortfall in the original order under the Purchase Order." The Letter Agreement concluded, "If this Letter Agreement reflects your understanding and agreement of the matters set forth herein, please sign in the space provided . . . ." Above the spaces provided for the signatures of Man's and Prime Pipe's representatives were the words "Agreed and accepted." Prime Pipe's project director signed the letter.

By executing the Letter Agreement, Prime Pipe agreed with Man and Midcontinent that a certain quantity of pipe would not be produced or sold, which necessarily meant that Prime Pipe agreed that this quantity would not be shipped. Because Prime Pipe's commission was equal to a portion of the value of shipped goods, Prime Pipe effectively agreed to a reduction in its commission.

We accordingly sustain this issue. We modify the award of actual damages to Prime Pipe to reduce it by $511,073.11. As modified, the total actual damages assessed against Man for Prime Pipe's claims is $998,475.10.

30

## D. Midcontinent's Cover Damages

Under the UCC, when a seller fails to make delivery, then "the buyer may cancel and whether or not he has done so may . . . 'cover' and have damages . . . as to all the goods affected whether or not they have been identified to the contract . . . ." TEX. BUS. & COM. CODE § 2.711(a)(1) (West 2009). A buyer covers the nondelivery "by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." *Id.* § 2.712(a). Although Man does not dispute that it breached the contract and that Midcontinent paid a fair market price to cover the shortfalls, Man contends that the evidence is factually insufficient to show that Midcontinent's decision to cover was both reasonable and in good faith. According to Man, Midcontinent could not reasonably and in good faith require Man to adhere to the production schedule because Midcontinent could have waived strict compliance with the production deadline without delaying the project.

This argument is without merit. Breach-of-contract remedies are available to a buyer when the seller fails to make any delivery. *Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 896 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) (op. on reh'g)); *W. B. Dunavant & Co. v. Southmost Growers, Inc.*, 561 S.W.2d 578, 583 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.). As Midcontinent correctly points out, "the test of whether Midcontinent rightly decided to cover is whether Man 'failed to make delivery.'" *See* TEX. BUS. & COM. CODE ANN. § 2.711(a).

It is undisputed that Man failed to make delivery in the time specified in the contract and that Midcontinent repeatedly insisted on adherence to agreed production schedules because "time was of the essence." Man accordingly agreed

31

in the Purchase Order that Midcontinent could terminate the contract, in whole or in part, if Man failed to timely perform its obligations or failed to give adequate assurance of its future performance on terms acceptable to Midcontinent.

Midcontinent additionally produced evidence that at that time it decided to cover the deficits, it did not believe that other factors would cause delays in the pipeline's construction during which Man could make up its own reduced production. The trial court was not required to determine whether, in hindsight, Midcontinent was correct or whether it instead could have waived Man's failure to comply with this material term of the contract without increasing the risk that the pipeline would have been delayed. *See* TEX. BUS. & COM. CODE ANN. § 2.712, cmt. 2 ("The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective."); *TrueStar Petroleum Corp. v. Eagle Oil & Gas Co.*, 323 S.W.3d 316, 320 (Tex. App.—Dallas 2010, no pet.) (explaining that, where the contract provided that "time is of the essence," failure to comply with the delivery deadline was a material breach that entitled the other party to exercise contractual remedies, even if that party would not have been damaged by excusing the late delivery). The obligation to act in good faith did not require Midcontinent to extend to Man another opportunity to produce the pipe. *See Deep Nines, Inc. v. McAfee, Inc.*, 246 S.W.3d 842, 848 (Tex. App.—Dallas 2008, no pet.) ("Once a party breaches a contract, giving rise to a cause of action, the rights of the non-breaching party are not affected by the breaching party's later offer to perform." (citing *Carrico v. Kondos*, 111 S.W.3d 582, 588 (Tex. App.—Fort Worth 2003, pet. denied))).

We overrule this issue and affirm this portion of the damage award.

## V. MIDCONTINENT'S CROSS-APPEAL

In five issues, Midcontinent contends that the trial court erred in enforcing the Letter Agreement in which Midcontinent agreed to pay Man an additional $4.4 million. In its first three issues, Midcontinent argues that the modification was ineffective because Man lacked good faith. In its fourth and fifth issues, Midcontinent argues that even if the modification was effective, Midcontinent did not breach the contract by paying $4.4 million into the registry of the court rather than directly to Man because Midcontinent's obligation to pay was excused by Man's prior material breach.

### A. Effectiveness of the Modification

Midcontinent contends that the Letter Agreement did not effectively modify Midcontinent's contract with Man because Man obtained the modification in bad faith. Under the UCC, every contract or duty "imposes an obligation of good faith in its performance and enforcement." TEX. BUS. & COM. CODE ANN. § 1.304 (West 2009). Modifications in a contract for the sale of goods therefore must meet the UCC's test of good faith. *Id.* § 2.209 cmt. 2. As used here, "good faith . . . means honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* § 1.201(b)(20). The trial court found that Midcontinent breached its enforceable agreement to pay Man $4.4 million; thus, all omitted unrequested findings necessary to support the judgment are supplied by presumption if supported by the record. TEX. R. CIV. P. 299. We therefore presume that the trial court found that Man sought the contract modification in good faith. More specifically, we presume that the trial court found that Man's decision to seek the modification was consistent with the "observance of reasonable commercial standards of fair dealing" and that Man acted with "honesty in fact." *See* TEX. BUS. & COM. CODE ANN. § 1.201(b)(20).

33

### 1. The Good-Faith Standard for a Modification

In disputing the presence or absence of Man's good faith, both parties have relied on *Roth Steel Products v Sharon Steel Corp.*, 705 F.2d 134 (6th Cir. 1983). Roth was cited with approval in *El Paso Natural Gas Co. v. Minco Oil & Gas Co.*, 958 S.W.2d 889, 901 & n.11 (Tex. App.—Amarillo 1997, pet. granted), *republished at* 964 S.W.2d 54, 67 & n.11, (Tex. App.—Amarillo 1997, pet. granted), *rev'd*, 8 S.W.3d 309 (Tex. 1999). The Supreme Court of Texas reversed on the ground that the UCC's duty of good faith did not apply at all to the releases of liability at issue in that case. 8 S.W.3d at 313. *Roth* has not been cited again by a Texas court. We decline to follow all of the reasoning of *Roth*.

In *Roth*, Sharon, the seller, produced sheet steel; Roth, the buyer, purchased the steel and used it to produce tubing. *Roth*, 705 F.2d at 137. In early 1973, a number of factors caused the domestic steel supply to decrease sharply at the same time that both demand and costs increased. *Id.* at 138. Sharon notified Roth in March 1973 that it was withdrawing all price concessions and offered to sell steel in the second half of 1973 at prices that were higher than those to which the parties initially agreed, but lower than Sharon's published prices. *Id.* Sharon "clearly indicated" to Roth that after June 30, 1973, Sharon would "sell no steel . . . except at modified prices." *Id.* Because it was otherwise unable to meet its production requirements, Roth agreed to the modification. *Id.* Throughout the second half of 1973 and most of 1974, Sharon experienced difficulties in filling orders in a timely fashion and refused to accept Roth's orders in October and December 1973. *Id.* at 138–38. Roth sued Sharon for breach of contract and to recover its expenses in "covering" the shortages. *Id* at 140. Sharon responded that the contract had been modified. *Id.* The district court found that Sharon acted in bad faith in seeking the modification. *Id.* at 146.

The *Roth* court stated that good faith involves two inquiries. First, the court must determine whether the party's conduct was "consistent with 'reasonable commercial standards of fair dealing in the trade.'" *Id.* at 145–46 (quoting *U.S. for Use & Benefit of Crane Co. v. Progressive Enters.*, 418 F. Supp. 662, 664 n.1 (E.D. Va. 1976)). To satisfy this portion of the test, "the party asserting the modification must demonstrate that his decision to seek modification was the result of a factor, such as increased costs, which would cause an ordinary merchant to seek a modification of the contract." *Id.* at 146. We agree that this portion of the *Roth* case comports with Texas law. *See* TEX. BUS. & COM. CODE ANN. § 2.209 cmt. 2 ("The test of 'good faith' between merchants . . . includes 'observance of reasonable commercial standards of fair dealing in the trade' . . . and may in some situations require an objectively demonstrable reason for seeking a modification.").

However, the *Roth* court went on to note that the single most important factor in determining whether a modification is justified is whether, because of change in the market or other *unforeseeable* conditions, performance of the contract has come to involve a loss. *Id.* at 147. We do not agree that a party must show that the change in market price was unforeseeable to meet the reasonable commercial standard of fair dealing. Nothing in the language of section 2.209, comment 2 incorporates the requirement of unforeseeability into that standard, nor has any Texas court adopted such a requirement.

Imposing such a requirement would mean that a party essentially would have to prove that performance is commercially impracticable because of unforeseen supervening circumstances. This is the standard set out in Texas Business and Commerce Code section 2.615, which concerns excuse. Yet the comment to 2.209 clearly states that a party does not need to meet that requirement for a modification: "But such matters as a market shift which makes performance

35

come to involve a loss may provide such a reason *even though there is no such unforeseen difficulty* as would make out a legal excuse from performance under Sections 2-615 and 2-616." TEX. BUS. & COM. CODE ANN. § 2.209 cmt. 2 (emphasis added).

The *Roth* court also looked at whether the requirement of subjective "honesty in fact" is satisfied. *Roth*, 705 F.2d at 146. The court did this by analyzing "whether the parties were in fact motivated to seek modification by an honest desire to compensate for commercial exigencies." *Id.* (citing *Ralston Purina Co. v. McNabb*, 381 F. Supp. 181, 183 (W.D. Tenn. 1974)). This language also would be a correct statement of Texas law.

In *Roth*, the court concluded that Sharon failed to establish the subjective element of honesty in fact. The trial court found that Sharon used its position as Roth's chief supplier to extract the price modification by threatening to stop selling steel to Roth after June 1973. *Id.* at 148. The reviewing court explained that such "coercive conduct" is evidence of bad faith.

Relying primarily on the discussion in *Roth* of the subjective and objective components of good faith, Midcontinent argues that the parties' modification of the contract in their Letter Agreement is ineffective because Man obtained it in bad faith. Midcontinent has framed this argument in different ways, complaining both that there is legally insufficient evidence of good faith and that the trial court's findings do not support its conclusion that the contract modification is enforceable. Because these challenges are reviewed differently, we discuss them separately.

### 2. *Legal-Sufficiency Challenge*

#### a. **The observance of reasonable commercial standards of fair dealing: objective good faith**.

Midcontinent asserts that a party seeking to modify a contract acts in

objective good faith only if it faces a *loss* as the result of conditions beyond that party's control that were *unforeseen* at the time it entered the contract. As stated above, the requirement that the change of conditions must be unforeseen is not Texas law.

Midcontinent also contends that the record conclusively establishes that Man faced only a reduction in its profits rather than a loss on the project, and thus, the absence of objective good faith is established as a matter of law. Although Midcontinent relies heavily on *Roth* in making this argument, the *Roth* court specifically disclaimed any intent "to imply that the desire to avoid a loss is the only permissible reason for seeking a modification of an existing agreement" and explained that it referred to this reason in its opinion only because it was "the primary justification offered in this instance." *Id.* at 146 n.25. Moreover, courts have held that a party can act in good faith by seeking a modification in response to precipitous market changes, even if the party is not attempting to avoid a loss but instead is attempting to obtain greater profits. *See Weisberg v. Handy & Harman*, 747 F.2d 416, 420–21 (7th Cir. 1984) ("[a] precipitous change in market price satisfies the requirement of good faith found in § 2.209"). The facts are undisputed that the prices rose dramatically during the course of the contract.

We conclude that under the applicable standard of review, the evidence is legally sufficient to support the trial court's implied finding that Man observed reasonable commercial standards of fair dealing, and thus, acted with objective good faith.

### b. Honesty in fact: subjective good faith

Midcontinent's challenge to this element is really not a legal-sufficiency challenge but instead focuses on what it sees as a conflict between the trial court's express findings and its implied finding of good faith. This will be discussed

below.

### 3.    *Conflict Between the Trial Court's Express and Implied Findings*

The judgment rendered after a nonjury trial must conform to the findings of fact. *See* Tex. R. Civ. P. 300. Although Midcontinent argues that the trial court's "findings" do not support its conclusions or establish the contrary proposition as a matter of law,[15] Midcontinent has focused on the trial court's express findings, not on its implied findings. By asserting that the trial court's express findings do not support the trial court's conclusions, Midcontinent in effect contends that the trial court's express and implied findings conflict.

Midcontinent never objected to the trial court about this conflict. Assuming without deciding that no complaint was needed in the trial court to preserve this argument, we conclude that the trial court's express findings do not fatally conflict with its implied findings. In reaching this conclusion, we have applied the same analysis that is used in evaluating complaints that jury findings fatally conflict. We will not set aside a judgment because of conflicting findings of fact if the conflict can be reconciled. *Morton v. Hung Nguyen*, 369 S.W.3d 659, 675 (Tex. App.—Houston [14th Dist.] 2012, pet. filed) (sub. op.). When attempting to reconcile jury findings, we apply a de novo standard of review. *See Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980). The threshold question is whether the findings address the same material fact. *Id.*

#### a.    The observance of reasonable commercial standards of fair dealing: objective good faith

To establish objective good faith, the party asserting the modification must

---

[15] Midcontinent frames this argument in language such as the following: "The trial court's findings of fact establish objective bad faith . . . ." "These findings prove Man's subjective bad faith as a matter of law." "[T]hose findings cannot be reconciled with its legal conclusion that [Midcontinent's] agreement to pay an additional $4.4 million was enforceable."

demonstrate that the decision to seek modification was the result of a factor, such as increased costs, that would cause an ordinary merchant to seek a modification of the contract. TEX. BUS. & COM. CODE ANN. § 2.209 cmt. 2. Midcontinent focused on a number of trial court findings that it characterizes as findings that Man could have foreseen the rise in prices. As discussed above, Texas law does not require that Man's decision to seek modification was the result of unforeseen price increases. Thus, there are no conflicts in the findings.

### b.    Honesty in fact: subjective good faith

Midcontinent contends that the trial court's finding of fraud and the findings below are inconsistent with an implied finding of honesty in fact:

- During negotiation of the parties' contract for steel pipe, [Midcontinent] stressed to Man and [Prime Pipe] the importance of maintaining its construction and completion schedule for the pipeline, and the corresponding importance of maintaining the production and delivery schedule of the pipe to be supplied by Man and [Prime Pipe].

- At various times throughout the term of the contract, Man proposed and [Midcontinent] rejected amended schedules that did not include the completion of production by the end of July 2008.

- The Purchase Order stated that time was of the essence.

- [T]he parties altered the [Purchase Order] and agreed that (1) [Midcontinent] would provide Man with an advance payment of $21,672,640.32 to allow Man to place its initial order for the steel necessary to produce [Midcontinent's] pipe, and (2) that [Midcontinent] would pay Man approximately $1,763,328.00. [Midcontinent] agreed to this [to] reimburse Man for the finance charges it would incur as a result of having to place letters of credit to third parties to secure further steel orders . . . .

- On several occasions throughout the term of the Purchase Order, [Midcontinent] asked Man whether it had secured the raw steel necessary to supply all of the pipe Man was required to manufacture.

- In 2007, Man represented to [Midcontinent] on several occasions that

it had secured all necessary steel to complete the order. By December 2007, both [Midcontinent] and Prime Pipe believed that Man had secured all steel necessary to complete the order.

- Man failed to inform [Midcontinent] that it did not secure all necessary steel to complete [Midcontinent's] order until March 2008. Although Man had reserved a production slot at various steel mills, it had not obligated or financially committed the steel mills to produce steel. Man knew these facts, knew that [Midcontinent] was unaware of these facts, and knew [Midcontinent] did not have an equal opportunity to discover the facts. Man deliberately sat silent about these facts.

- Man intended to induce [Midcontinent] to act to [Midcontinent's] detriment by failing to disclose that it did not secure all necessary steel to complete [Midcontinent's] order until March 2008 and that it had not obligated or financially committed the steel mills to produce steel. [Midcontinent] justifiably relied on Man's non-disclosure and was injured as a result of acting without knowledge of these facts.

- In March and April 2007 [sic], Man told [Midcontinent] that if it did not pay additional monies above the agreed contract price in order to purchase the remaining steel, Man could not complete the Purchase Order even though it had failed to avail itself of opportunities to purchase steel at lower prices in the [f]all of 2007.

- Man, not [Midcontinent], controlled the timing in which it purchased the raw steel necessary for pipe production, and thus Man, not [Midcontinent], controlled the price at which it purchased the steel.

- The increase or rise in steel prices was reasonably foreseeable to Man at the time of the Letter Agreement [that modified the parties' contract].

Midcontinent compares the circumstances described above to the "coercive conduct" described in *Roth*. It is stated in Texas Business and Commerce Code section 2.209, comment 2 that the "extortion of a 'modification' without legitimate commercial reason is ineffective."

The trial court's findings do not support either a coercion finding or an extortion finding. To extort is to "obtain from a person by force, intimidation, or

undue or illegal power." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 440 (1991). "Coercion exists when a party by the unlawful conduct of another, is induced to enter into a contract which deprives him of the exercise of his free will." *Metro-Goldwyn-Mayer Distrib. Corp. v Cocke*, 56 S.W.2d 489, 491 (Tex. Civ. App.—Amarillo 1933, no writ). In Texas, the term "duress" rather than "coercion" is generally used when parties are seeking to avoid a contract. "A common element of duress in all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property) is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and does interfere with another person's exercise of free will and judgment." *Dall. Cnty. Cmty. Coll. Dist. v Bolton*, 185 S.W.3d 868, 878 (Tex. 2005). The trial court findings do not rise to the level of extortion, coercion, or duress.

The trial court's findings do not even rise to the level of fraudulent inducement to enter into the modification. The trial court also found that "[o]n or about March 11, 2008, Man informed [Midcontinent] that Man had failed to purchase and secure the final 40,000 metric tons of raw steel needed to complete the job" and that the parties entered into the Letter Agreement on April 16, 2008; thus, when Midcontinent agreed to the contract modification, it had been aware of the true state of affairs for more than a month. This negates fraudulent inducement. *See In re FirstMerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001) (explaining that a fraudulent-inducement claim requires proof of reliance on a false representation); *cf. Williams v. Dardenne*, 345 S.W.3d 118, 126 (Tex. App.— Houston [1st Dist.] 2011 pet. denied) ("[A] party who has actual knowledge of specific facts cannot have relied on a misrepresentation of the same facts.").

None of the trial court's express findings conflict with an implied finding of honesty in fact. We accordingly conclude that the trial court's express and implied

41

findings do not conflict, and that the trial court's conclusions of law and the judgment itself are consistent with both. We overrule Midcontinent's first three issues.

## B. Effect of Prior Material Breach

Midcontinent points out that after the parties executed the Letter Agreement modifying the contract, Man failed to deliver the pipe according to the agreed-upon schedule. According to Midcontinent, this was a material breach that excused Midcontinent from its duty to pay for the pipe. In support of this argument, Midcontinent relies on the fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the nonbreaching party is discharged or excused from further performance. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam).

But another equally fundamental principle also applies here: when one party materially breaches a contract, the nonbreaching party must choose whether to treat the contract as terminated or as continuing. *See Kennedy Ship & Repair, L.P. v. Pham*, 210 S.W.3d 11, 25 (Tex. App.—Houston [14th Dist.] 2006, no pet.). A nonbreaching party who treats the contract as continuing "'deprives himself of any excuse for ceasing performance on his own part.'" *Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam) (quoting *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982)). Moreover, a nonbreaching party conclusively chooses to treat the contract as continuing if it seeks to benefit from the contract after the other party's material breach. *See Henry v. Masson*, 333 S.W.3d 825, 841 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Here, Midcontinent treated the contract as continuing by accepting the belated delivery. *See* Tex. Bus. & Com. Code Ann. § 2.601 cmt. 2 (West 2009)

("Acceptance [of a non-conforming tender] made with the knowledge of the other party is final."). It also sought to and did benefit from the modified contract by drawing on the standby letter of credit that Man provided in accordance with the Letter Agreement. Because it chose by these actions to treat its contract with Man as continuing, Midcontinent cannot rely on Man's prior material breach as an excuse for its own nonperformance.

We overrule Midcontinent's fourth and fifth issues and affirm the portion of the judgment offsetting the damages awarded to Midcontinent by $4.4 million, representing the increased amount that Midcontinent agreed but failed to pay to Man under the terms of the Letter Agreement.

## VI. CONCLUSION

With regard to Man's appeal of amounts awarded to Midcontinent, we conclude that the trial court properly applied Texas law and that the evidence supports Man's liability for the damages awarded.

As for Man's appeal of the claims by and against Prime Pipe, we agree that the trial court erred in including in Prime Pipe's damage award $511,073.11 as commission on the sale of pipes that were not actually sold, but that instead were eliminated from the Purchase Order in April 2008 with Prime Pipe's consent. The trial court did not err, however, in failing to conclude that Prime Pipe breached a fiduciary duty to Man.

Finally, we conclude that the trial court did not err in concluding that the Letter Agreement was an enforceable modification of the Purchase Order, or in concluding that Midcontinent breached that agreement.

We accordingly

- modify the award of actual damages to Prime Pipe to reduce it by

43

$511,073.11, bringing its total award of actual damages to $998,475.10;

- affirm the remaining damage awards; and

- remand the case to the trial court for recalculation of offsets and prejudgment interest, and for rendition of judgment in accordance with this opinion.

/s/    Tracy Christopher
        Justice

Panel consists of Justices Frost, Christopher, and Jamison (Frost, J., concurring).

44