Opinion filed September 25, 2020



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00246-CV

_____

## DOWTECH SPECIALTY CONTRACTORS, INC., Appellant

## V.

## CITY OF WEINERT, TEXAS, Appellee

### On Appeal from the 39th District Court
### Haskell County, Texas
### Trial Court Cause No. 12278

### O P I N I O N

Appellant, Dowtech Specialty Contractors, Inc., sued Appellee, the City of Weinert, Texas, for breach of contract after the City refused to pay Dowtech's final payment request on a contract for the construction of improvements to the City's pump station. Dowtech sought to recover both the unpaid balance on the contract and the charges for work outside the original scope of the contract. The City filed counterclaims for breach of contract and for breach of warranty and requested either liquidated damages under the contract or, alternatively, the costs to complete the unfinished work as well as its "repair expenses."

After a bench trial, the trial court ordered the City to pay Dowtech $2,052.50 for the additional work that Dowtech performed and denied Dowtech's request for the contract balance and for interest, the City's request for damages, and both Dowtech's and the City's request for attorney's fees. In three issues, Dowtech contends that the trial court erred when it determined (1) that Dowtech was not entitled to recover on its claim for the contract balance, (2) that a change order that reduced the amount of the contract was valid, and (3) that Dowtech was not entitled to recover attorney's fees. We affirm the trial court's judgment.

*Background*

The City's water supply is a combination of well water and water obtained from the North Central Texas Municipal Water Authority (the NCTMWA). Because the nitrates in the well water were in excess of regulatory limits, the well water needed to be treated before it was distributed. To allow it to treat the well water, the City decided to construct improvements to its pump station to separate the well water system from the NCTMWA system and to "pressurize" the water distribution system. The City ultimately obtained a total of $296,587 in grants for the project from the Texas Department of Agriculture, the Texas Water Development Board, and the Haskell County Water Supply District No. 1.

The City hired Chester Theodore Carthel, a civil engineer, to assist on the project. Carthel prepared the plans, the technical specifications, and the bid package. The bid form set out a number of "line items" for different parts of the project. The bid was the total of the costs for each line item.

The bid form contained a line item for "NCTWMA [sic] controls & communication allowance." According to Carthel, this line item was for Supervisory Control and Data Acquisition (SCADA) work that would allow the NCTMWA to open and close the valve on its supply line. MGM Controls, LLC was selected to do this work.

On June 4, 2015, in Addendum No. 1 to the bid documents,[1] Carthel provided to the bidders an e-mail from MGM Controls that "outlin[ed] the scope of work for the $20,000 NCTWA [sic] instrumentation line item." In the e-mail, Leland Godbee, the vice president of MGM Controls, stated that MGM Controls' work was related to the "control valve" and the "Tank pressure transmitter." MGM Controls would also provide "modifications to NCTWMA [sic] programs" and a maximum of four hours of training on "troubleshooting and normal operation." The cost for MGM Controls' work was $20,800. Attached to Addendum No. 1 was a bid form with $20,000 entered for the NCTMWA controls and communication allowance line item.

On June 5, 2015, in Addendum No. 2 to the bid documents, Carthel provided the bidders with a revised bid form for the project. Carthel specifically noted that the "NCTMWA instrumentation allowance was adjusted to $21,000.00 to better match the estimate from MGM Controls of $20,800."

On June 23, 2015, in Addendum No. 4 to the bid documents, Carthel noted that the "Process & Instrumentation Diagram" had been revised. The revised diagram depicted a valve in the NCTMWA line with an M in a square above it. Next to the valve was the notation "NCTMWA control/comm. panel."

Carthel also attached a revised bid form to be used for the project. Carthel specifically noted that line items had been added for "distribution/well line separation work" and for "Control Systems" and that the "Pumps" line item had been modified "to remove pump controls and have unit price for each pump."

Carthel instructed the bidders that "Specification Section 13400 – Instrumentation and Control" should be replaced with a revised section that was

---

[1]The addenda to the bid documents were part of the contract. In the addenda, Carthel provided detailed information about the bid process and made changes to the bid form, the drawings, and the specifications. We set out only those changes that are relevant to the issues in this appeal.

attached to Addendum No. 4. The revised Section 13400 contained the "requirements, procedures, and equipment specifications for furnishing and installing a complete and operational control system and accessories." The revised Section 13400 also provided that "**[n]ot every component necessary for a complete and operational system had been specified**" and that it was the "**Contractor's responsibility to provide and furnish ALL items necessary to monitor the systems specified, control the systems necessary, and communicate with the necessary components.**"

The revised Section 13400 set out "System Loop Descriptions" to generally describe the "operational intent of the control loops." For the "Service Pump Loop," which controlled three service pumps, both the line pressure and the level in the ground storage tank were required to be transmitted to the pump control panel. When the line pressure reached a preset level, the pump control panel would start the lead pump. When the line pressure dropped to a preset level, the pump control panel would start the lag pump. When the line pressure reached "the high pressure," the pump control panel would turn off all the pumps. The pump control panel would also turn the pumps off or on based on the level in the ground storage tank.

The revised Section 13400 specified that the pump control panel was required to indicate the status of each pump, the line pressure level, and the pump run time; to record the pump run time and the line pressure; to communicate with the "Well Communication System to start or stop the wells based on the ground storage tank level"; and to have audible and visual alarms for high or low level in the ground storage tank and for high or low pressure in the water distribution system. It also contained specifications for (1) a "level indicating transmitter" on the ground storage tank; (2) a "Well Communication System" that required a FreeWave FGR2 series, or equivalent, radio, an antenna, "wiring and other components for a complete spread spectrum radio communication system to the existing wells," and "a Yagi style

4

directional antennae [sic] mounted on the pump station building to communicate with the existing well antennae"; (3) an autodialer alarm; and (4) audible and visual alarms on the exterior of the pump station.

Finally, in Addendum No. 5 to the bid documents, Carthel instructed the bidders to "add another FreeWave FGR2 radio receiver/transmitter to receive signals from the pump station to start and stop the wells." The radio was "to be installed by the Contractor at the existing Weinert well field" to an existing antenna.

Dowtech and L. Howard Construction, Inc. submitted bids on the project. On July 10, 2015, MGM Controls agreed to do the "NCTMWA SCADA work" for $15,000. Both Dowtech's and L. Howard's bids were adjusted to reflect the reduction in the NCTMWA controls and communication allowance as well as the removal of certain line items related to improvements to the restroom at the pump station. Dowtech's adjusted bid was $309,247.75, and L. Howard's adjusted bid was $341,812.83. Over $34,500 of the discrepancy between the two bids was in the line item for control systems. Dowtech bid $5,220 for the control systems line item while L. Howard bid $39,750. The City awarded the contract to Dowtech on July 16, 2015.

At a pre-construction meeting on August 21, 2015, the parties discussed that Dowtech's bid exceeded the amount of the grants that the City had received. The City informed Dowtech that, in order to decrease the amount of the contract, the City intended to issue a change order that reduced the size of the pump house. At the pre-construction meeting, Dowtech did not object to the reduced contract amount.

Dowtech and the City executed the contract on September 30, 2015. On October 29, 2015, Carthel certified to the Texas Water Development Board that the City had sufficient funds to pay the contract price of $309,247.75. In November 2015, Carthel issued Change Order No. 1 that reduced the size of the pump house

and lowered the contract price to $293,751.35. Although the change order contained an acceptance block for Dowtech, Dowtech did not sign Change Order No. 1.

On January 12, 2016, Clint Carlile, Dowtech's foreman, sent a request for information to Carthel about the valve in the NCTMWA line. Carlile specifically asked if the valve was "motor controlled" and noted that, if the valve was "motor controlled," he needed specifications for the valve. Carlile also asked if the valve was "included in the NCTMWA line item." In an e-mail on January 20, 2016, Carlile noted that he had not received a response to the request for information. On January 25, 2016, Carlile informed Carthel that, because he had not received a response to the request for information, he had released the order for a gate valve that was not motor operated.

Dowtech submitted pay requests as it performed work on the contract. Carthel was required to approve the pay requests and then submit the requests to the funding agencies. Dowtech did not receive regular payments and, at some point, threatened to stop work on the project. From January 19, 2016, through September 2, 2016, the City issued four checks to Dowtech in a total amount of $233,872.28.

On May 3, 2016, Carthel issued Change Order No. 2 that required Dowtech to move a meter vault. The cost for this work was $2,052.50. Dowtech did not sign Change Order No. 2.

Carthel inspected the project after Dowtech indicated that it had completed its work. Carthel prepared a "punch list" of items that had not been completed. The items included the installation of (1) a motor operated valve on the NCTMWA supply line, (2) a radio communication system between the pump station and the well field, (3) the SCADA system to signal the wells to activate and deactivate, (4) a level indicator for the ground storage tank, (5) an autodialer alarm, and (6) audible and visible alarms. Carthel also noted that the pump control panel neither indicated

the run hours for each pump nor electronically recorded the pump run time and line pressure.

Dowtech claimed that it had completed all of the work required by the contract. It asserted that the contract did not require a motor operated valve on the supply line from the NCTMWA. Dowtech also contended that much of the work that had not been completed was SCADA work that MGM Controls was required to perform, that it had not selected MGM Controls to do the work, and that it had no ability to compel MGM Controls to do the work.

Without completing the work on the punch list, Dowtech submitted a final pay estimate on September 6, 2016, in the amount of $84,004.37. The City declared Dowtech to be in default and terminated the contract on September 9, 2016.

Dowtech sued the City for breach of contract and sought to recover both the contract balance and the charges for the additional work that it had performed. The City filed counterclaims for breach of contract and breach of warranty and requested either liquidated damages or the expenses that it had incurred to complete some of the work and to repair two of the pumps. Both Dowtech and the City requested an award of attorney's fees.

The case was tried to the bench. In its final judgment, the trial court found (1) that MGM Controls was Dowtech's subcontractor, (2) that the change orders were signed and valid and that the decrease in the original contract price by the City was valid, (3) that Dowtech did not complete all work as required under the contract, (4) that the City terminated Dowtech's right to complete the work, and (5) that the City paid Dowtech $233,872.98 of the $293,745.75 contract price. The trial court ordered the City to pay Dowtech $2,052.50 for the additional work that Dowtech performed and denied Dowtech's request for the contract balance and for interest, the City's request for damages, and both Dowtech's and the City's request for

7

attorney's fees. Neither Dowtech nor the City requested additional findings of fact or conclusions of law.

*Analysis*

In its first issue, Dowtech asserts that the trial court erred when it failed to award Dowtech the contract balance because (1) Dowtech's performance under the contract was excused based on the City's "multiple breaches," (2) the City is liable to Dowtech for the contract price, and (3) alternatively, the City is liable for actual damages.

A claim that a party is excused from performance under a contract by the other party's prior material breach is an affirmative defense. *Leonard v. Knight*, 551 S.W.3d 905, 910 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Park v. Payne*, 381 S.W.3d 615, 618 (Tex. App.—Eastland 2012, no pet.). An affirmative defense must be pleaded or it is waived. TEX. R. CIV. P. 94; *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.—Dallas 2005, pet. denied). Dowtech did not plead the affirmative defense that its performance under the contract was excused and does not argue that the issue was tried by consent. Therefore, Dowtech failed to preserve this complaint for appellate review. *See* TEX. R. CIV. P. 94; *Compass Bank*, 152 S.W.3d at 851.

Further, even if preserved, Dowtech's complaint has no merit. Dowtech had the burden to prove its affirmative defense that its performance under the contract was excused by the City's prior material breach. *Purnell Furniture Servs., Inc. v. Warehouse Rack Co.*, No. 14-04-00270-CV, 2006 WL 2167229, at *3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2006, no pet.) (mem. op.); *see also Orr v. Broussard*, 565 S.W.3d 415, 422 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Dowtech argues that it met this burden because the evidence established that the City breached the contract by paying late, by attempting to reduce the price of a non-unit item contract, by "playing cat and mouse with its position on MGM and the SCADA,"

8

and by failing to respond to the request for information about the motor operated valve. Dowtech essentially challenges the sufficiency of the evidence to support the trial court's failure to find that the City committed a prior material breach that excused Dowtech's performance under the contract.

In an appeal from a judgment that was rendered after a bench trial, the trial court's findings of fact have the same weight as a jury verdict, and we review the sufficiency of the evidence to support the findings using the same standards as when we review a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When, as in this case, the trial court did not make findings of fact and conclusions of law on the disputed issue, "we imply all relevant facts necessary to support the judgment that are supported by evidence." *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). We will affirm the trial court's judgment if it can be upheld on any legal theory supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *Builders First Source–S. Tex., LP v. Ortiz*, 515 S.W.3d 451, 456 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

An appellant who attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)). When we consider a legal sufficiency challenge, we "must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id.* (citing Sterner, 767 S.W.2d at 690); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (When appellate court considers a no-evidence challenge, it views the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not.). Only if there is no evidence to support the finding will

9

we examine the entire record to determine if the contrary proposition is established as a matter of law. *Francis*, 46 S.W.3d at 241.

"The 'test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.'" *W&T Offshore, Inc. v. Fredieu*, No. 18-1134, 2020 WL 3240869, at *9 (Tex. June 5, 2020) (quoting *City of Keller*, 168 S.W.3d at 827). We must uphold the factfinder's verdict if more than a scintilla of evidence supports the judgment. *Id.* We will sustain a challenge to the legal sufficiency of the evidence only if (1) there is a complete lack of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) there is no more than a scintilla of evidence offered to prove a vital fact, or (4) the opposite of the vital fact is conclusively established. *Pike v. Tex. EMC Mgmt., LLC*, No. 17-0557, 2020 WL 3405812, at *14 (Tex. June 19, 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)).

To successfully challenge the factual sufficiency of the evidence to support an adverse finding on an issue on which it bore the burden of proof at trial, the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must consider and weigh all of the evidence and will set aside a verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Francis*, 46 S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

It is the factfinder's role to evaluate the credibility of the witnesses and reconcile any inconsistencies or conflicts in the evidence. *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). Generally, the factfinder may believe or disregard all or any part of the testimony of any witness.

*Anderson*, 550 S.W.3d at 616; *Golden Eagle Archery*, 116 S.W.3d at 774–75. We will not substitute our opinions on credibility for those of the factfinder. *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019) (factual sufficiency); *City of Keller*, 168 S.W.3d at 816–17 (legal sufficiency).

"[W]hen one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). "But '[a] party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part.'" *Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam) (alteration in original) (quoting *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982)); *Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). "[A] nonbreaching party conclusively chooses to treat the contract as continuing if it seeks to benefit from the contract after the other party's material breach." *Man Indus.*, 407 SW.3d at 368; *see also Henry v. Masson*, 333 S.W.3d 825, 841 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

The uncontroverted evidence demonstrated that Dowtech sought to benefit from the contract after the City paid late, issued Change Order No. 1, and failed to respond to the request for information. Specifically, the evidence established (1) that, even though the City "paid late," Dowtech accepted the late payments and continued its work under the contract; (2) that, after the City issued Change Order No. 1 that reduced the size of the pump house and decreased the price of the contract, Dowtech not only constructed the pump house but continued its other work under the contract; and (3) that, after the City failed to respond to Carlile's request for information on whether a motor operated valve was required on the NCTMWA

11

supply line, Dowtech ordered a valve and continued its work under the contract. Because Dowtech chose to treat the contract as continuing after these alleged breaches by the City, Dowtech's performance under the contract was not excused. *See Long Trusts*, 222 S.W.3d at 415; *Man Indus.*, 407 S.W.3d at 368.

As to Dowtech's contention that it was excused from performance under the contract because the City "play[ed] cat and mouse with its position on MGM and the SCADA," the evidence reflects that the City included a line item in the bid for SCADA work by MGM Controls that would allow the NCTMWA to control the valve on its supply line. The scope of MGM Controls' work for the "NCTWMA [sic] controls & communication" did not include work related to the pumps.

In addition to the NCTMWA controls and communications line item, the original bid form included a line item for "Pumps & controls." In Addendum No. 4, Carthel informed the bidders that a line item had been added for "Control Systems" and that the "Pumps line item" had been modified to remove pump controls. Carthel also instructed the parties that "Section 13400 – Instrumentation and Control" had been revised. The revised specification contained detailed information on the pump control system but did not reference the control system for the valve on the NCTMWA supply line.

The revised Section 13400 provided that it was the contractor's responsibility to install the pump control system. Specifically, the contractor was required to provide and install (1) a "level indicating transmitter" that would report the ground storage tank level to the pump control panel; (2) a pressure transmitter that would report the line pressure to the pump control panel; (3) a pump control panel that would start a pump at a certain line pressure; that would indicate the pump status, the line pressure, and the pump run time; that would electronically record the line pressure and the pump run time; that would shut off all pumps when the high pressure was reached; that would turn all pumps off or on based on the level in the

12

tank; that would communicate with the Well Communication System to start or stop the wells based on the water level in the tank; and that had audible and visual alarms for high or low level in the ground storage tank and for high or low pressure in the water distribution system; (4) a Well Communication System consisting of radios and associated equipment that allowed for communication between the well field and the pump house; (5) an autodialer alarm; and (6) audio and visual alarms on the exterior of the pump station. There was no evidence that any of this equipment pertained to the valve in the NCTMWA supply line.

Through Addendum No. 4, the City informed Dowtech that the "Control Systems" line item was separate from the "NCTMWA" line item and that the contractor, not MGM Controls, had the responsibility to install the necessary control systems. The City also provided Dowtech with the specifications for the pump control system. After Dowtech contended that it had completed all of the work required by the contract, Carthel prepared a punch list that included the installation of the necessary equipment for the pump control system. There was no evidence that the City ever took the position that Dowtech was not responsible for the pump control system. Therefore, the evidence was legally sufficient to support the trial court's implied finding that the City did not breach the contract by "playing cat and mouse with its position on MGM and the SCADA."

As to the factual sufficiency of the evidence to support the trial court's implied finding, Gerald Downing, the owner of Dowtech, testified that all of the equipment that was not installed was the responsibility of MGM Controls. However, as discussed above, the "Control Systems" line item, which applied to the pumps, was separate from the "NCTMWA" line item that was the subject of MGM Controls' work. Further, the revised Section 13400 that was attached to Addendum No. 4 provided that the contractor was responsible for the installation of the pump control system. Carthel reiterated that the pump control system was the contractor's

responsibility when, in Addendum No. 5, he instructed the bidders to add another radio.

Further, L. Howard, the other bidder on the project, estimated that the "Control Systems" line item would cost $39,750. L. Howard's estimate was $34,530 more than Dowtech's estimate for the same line item. The trial court, therefore, could reasonably infer that L. Howard included more "control" equipment in its bid than Dowtech included in its bid. Finally, in June 2016, Dowtech sought a bid from MGM Controls for the equipment that had not been installed. MGM Controls provided an estimate for its costs to provide and install the equipment, which supports an inference that MGM Controls did not include those items in the NCTMWA line item.

Based on this record, the implied findings by the trial court that the City informed Dowtech through Addendum No. 4 that it was the responsibility of the contractor to install the pump control system, that Dowtech neither included the pump control system equipment in its bid nor installed the pump control system, and that the City never took the position that Dowtech was not responsible for the pump control system are not against the great weight and preponderance of the evidence. Therefore, the evidence was factually sufficient to support the trial court's implied finding that the City did not breach the contract by "playing cat and mouse with its position on MGM and the SCADA."

In its summary of the argument for its first issue, Dowtech also asserts that the trial court erred when it denied Dowtech's claim for breach of contract based on the findings that MGM Controls was Dowtech's subcontractor and that Dowtech did not complete all work required under the contract. However, in its first issue, Dowtech did not substantively argue any error by the trial court when it made either of these findings. Therefore, Dowtech waived any challenges to these findings on appeal. *See* TEX. R. APP. P. 38.1; *see also St. John Missionary Baptist Church v.*

14

*Flakes*, 595 S.W.3d 211, 215 (Tex. 2020) (noting that court of appeals has authority to deem an unbriefed point waived).

Even if preserved, Dowtech's position is unpersuasive. As set out above, there was both legally and factually sufficient evidence that Dowtech was required by the contract to install the pump control system and that Dowtech failed to perform this work. Therefore, the trial court did not err when it denied Dowtech's request for the contract balance based on a finding that Dowtech did not complete all work as required by the contract. Accordingly, we need not address Dowtech's complaint that the trial court erred when it denied Dowtech's request for the contract balance based on the finding that MGM Controls was Dowtech's subcontractor. *See* TEX. R. APP. P. 47.1.

Finally, in a footnote, Dowtech argues, "Inexplicably, the trial Court denied interest even though it found Dowtech to be entitled to $2052.50 for unpaid additional work. Though small, this failure to award interest is revers[i]ble error." Generally, to preserve a complaint for appellate review, the party must present the complaint to the trial court by timely request, objection, or motion. TEX. R. APP. P. 33.1(a). Dowtech did not file a motion for new trial or otherwise object to the trial court's failure to award prejudgment interest. Therefore, Dowtech failed to preserve this issue for our review. *See id.*; *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987) (per curiam) (holding that, because the plaintiff did not complain to the trial court of its failure to award prejudgment interest and did not assign a point of error on appeal to the issue, she failed to preserve complaint for appellate review); *JSC Nizhnedneprovsky Tube Rolling Plant v. United Res., LP*, No. 13-15-00151-CV, 2016 WL 8921926, at *12 (Tex. App.—Corpus Christi–Edinburgh Dec. 21, 2016, no pet.) (mem. op.).

On this record, even if Dowtech preserved its complaint that its performance under the contract was excused, the trial court did not err when it denied Dowtech's request to recover the contract balance. Because Dowtech failed to establish that it was entitled to recover the contract balance, we need not address Dowtech's remaining complaints in its first issue as to the amount of damages it should recover on the claim. *See* TEX. R. APP. P. 47.1. We overrule Dowtech's first issue.

In its second issue, Dowtech contends that the trial court erred when it found that Change Order No. 1 was valid and that the price of the contract was $293,745.75. This issue is relevant only to the amount of damages that Dowtech would be entitled to recover if it had prevailed on its claim for the contract balance. Because we have held that the trial court did not err when it determined that Dowtech was not entitled to recover the contract balance, we need not address this issue. *See id.*

In its third issue, Dowtech argues that the trial court erred when it failed to award attorney's fees in the amount of $65,000 to Dowtech. The parties stipulated that attorney's fees in the amount of $65,000 were reasonable and necessary.[2]

We review a trial court's decision to award attorney's fees for an abuse of discretion. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without regard to guiding legal principles. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

To be entitled to an award of attorney's fees from the opposing party, a party must prove that the recovery of attorney's fees is legally authorized and that the

---

[2]The parties presented no evidence in support of the stipulation that attorney's fees in the amount of $65,000 were reasonable and necessary, and the record reflects that the stipulated amount included appellate attorney's fees that were not contingent on a party's success on appeal. Because we need not determine whether the fees were reasonable and necessary in order to address Dowtech's complaints, we express no opinion on whether attorney's fees in the amount of $65,000 were reasonable or necessary.

requested attorney's fees are reasonable and necessary for the legal representation. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487 (Tex. 2019). On both its claim for the contract balance and its claim based on the additional work, Dowtech sought an award of attorney's fees pursuant to Section 271.153(a)(3) of the Texas Local Government Code. Section 271.153(a)(3) provides that an award of money in an adjudication brought against a local governmental entity for breach of contract "is limited to," among other things, "reasonable and necessary attorney's fees that are equitable and just." TEX. LOC. GOV'T CODE ANN. § 271.153(a)(3) (West 2016).

"Matters of equity are addressed to the trial court's discretion." *Bocquet*, 972 S.W.2d at 21. The trial court has discretion to "conclude that it is not equitable or just to award even reasonable and necessary fees." *Id.*; *see also Bailey v. Smith*, 581 S.W.3d 374, 398 (Tex. App.—Austin 2019, pet. filed). The question of whether a fee award would be equitable and just is "a matter of fairness in light of all the circumstances." *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162 (Tex. 2004). "The trial court must decide whether it would be just and equitable to award" the fees. *Id.* at 163. Whether an award of attorney's fees is equitable and just is a question of law. *Bocquet*, 972 S.W.2d at 21.

Dowtech asserts that the trial court erred when it failed to award to Dowtech the reasonable and necessary fees stipulated to by the parties because "Dowtech was the prevailing party. Not only did Dowtech obtain damages, but it defeated a $190,000.00 counterclaim." However, although the City was not awarded damages on its counterclaims, Dowtech was not awarded damages on its claim to recover the contract balance. Rather, Dowtech recovered damages of $2,052.50 based only on its claim that the City had not paid for the additional work. The trial court had discretion, in light of all the circumstances, to determine that it was not "equitable

17

and just" to award Dowtech attorney's fees in the amount of $65,000.[3]  *See Ridge Oil*, 148 S.W.3d at 162; *Bocquet*, 972 S.W.2d at 21.  Because there is no indication in the record that the trial court's decision was arbitrary or unreasonable, we will not reverse the trial court's judgment.  *See Ridge Oil*, 148 S.W.3d at 163.  We overrule Dowtech's third issue.

*This Court's Ruling*

We affirm the trial court's judgment.


KEITH STRETCHER

JUSTICE


September 25, 2020

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[4]

Willson, J., not participating.

---

[3]Because Dowtech argues only that the trial court should have awarded attorney's fees in the amount of $65,000, we do not address whether the trial court erred when it failed to award any attorney's fees or whether an award of a different amount of fees would be equitable and just.

[4]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.